## IN RE TERREGROSA, RESPONDENT.

PETITION by the Attorney General for Disbarment of Respondent from Practice as Attorney and Notary.

### No. 9.—Decided July 23, 1917.

ATTORNEYS—DISBARMENT—NOTARIES PUBLIC—WILL.—An attorney who in the exercise of the powers conferred upon him by his license to practice as notary attests that a person executed his last will before him, when, in fact, such person was moribund and could not and did not express his will, should not be allowed to continue to practice as attorney.

ID.—EVIDENCE—PRESUMPTION.—When evidence is voluntarily suppressed by a party it must be presumed that it would be adverse to him if introduced.

The facts are stated in the opinion.

*Messrs. Salvador Mestre, Fiscal* of the Supreme Court, and *José E. Figueras,* district *fiscal,* for the petitioner.

*Messrs. Luis Llorens Torres* and *Nemesio R. Canales* for the respondent.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is a proceeding for disbarment. Angel M. Torregrosa, acting as a notary public under his license as an attorney-at-law, attested the will of Artemio Vergne Muñoz in Aguadilla on March 9, 1915, and a charge was laid against him that the will was a forgery.

After the complaint was filed there arose several questions of law which were disposed of by the court and a day

was set for hearing the evidence, consisting of documents and the testimony of witnesses.

The will referred to reads literally as follows:

"No. 13.—*Open Will.*—In the city of Aguadilla at 3 p. m. of this 9th day of March, 1915, before me, Angel M. Torregrosa, a lawyer and notary public of Porto Rico residing and practicing in Aguadilla, personally appeared, in his dwelling-house to which I had proceeded as requested, Artemio Vergne Muñoz, fifty years of age, unmarried, merchant, resident of this city and legitimate son of Guillermo and Soledad. Being in the full enjoyment of his mental faculties, with power of speech and the necessary legal capacity to make a will, in the opinion of the witnesses and of myself, as well as of his physician, Dr. Simón Moret y Muñoz, who attended him and assured me that notwithstanding the illness of which he is bedridden the said Vergne had full use of his senses, the latter made his will as follows: He appoints Agustín Guevara y Santini as his executor and charges him with the arrangement for his funeral · and burial. He declares that he has no ascendants nor descendants, legitimate or natural. He orders that the inventory of his property be made by his executor in accordance with the books, papers and accounts which may be found after his death. He states that he has an interest as partner in the firm doing business in this city as López & Vergne, that he has some debts and some credits which he wishes paid and collected punctually, but that at the moment he cannot determine the amount of either. After the expenses of his illness and death and his debts are paid the residue of his property is left to his relative Josefa Muñoz Rivera de Guevara as his sole and universal heir in consideration of the kindness she has shown to him. He revokes and annuls any other prior disposition of his property which he may have made either orally or in writing. This is his will which he does not sign on account of physical inability, but he authorizes the first of the witnesses to sign it in his name. The witnesses present are Enrique Falcón, Rosendo Pérez and José V. Cintrón, who are known to me personally as residents and of age. I, the notary, knowing the testator and the witnesses, certify to the contents hereof and to the fact that the provisions of the Civil Code have been complied with as well as to the fact that amendment 'V' was approved by the testator and the witnesses. (Signed) Enrique Falcón, for the testator and as witness. Rosendo Pérez. José V. Cintrón. Dr. Moret Muñoz. Angel M. Torregrosa."

The evidence introduced by the complainant tended to show that Artemio Vergne Muñoz was suffering from a protracted illness; that he underwent two operations; that for some days prior to his death he was in such a state of prostration that he could not perform any physical act which depended upon his own volition, and that on the day before his death he was *in extremis* and took notice of nothing. This being the case, it is evident that Vergne could not execute the will. The evidence for the defense tended to show that although Vergne was seriously ill he always retained control of his faculties, and that on the day before he died his physician sent for Notary Torregrosa at Vergne's own request and Vergne executed his will before the notary with all the formalities of law.

The conflict is manifest and it is the duty of this court to consider and adjust it. The matter is a grave one. An attorney who in the exercise of the functions of a notary public by virtue of his license to practice law declares that a man executed his last will before him when, as a matter of fact, that man was at the point of death and could not and did not state his wishes, should not continue to be an attorney-at-law. The very gravity of the act and the fact that if the will were forged the persons who were present when it was executed participated more or less directly in the criminal act, make the ascertainment of the truth difficult.

That on March 9, 1915, Vergne was at the door of death is admitted by both sides. It is also admitted that Attorney and Notary Torregrosa, Doctor Moret and the other persons who took part in the execution of the will went to Vergne's house and that the will was made there on the said date. Does the document contain the last will of Vergne? Was Vergne in a condition to express it?

Vergne was a merchant doing business in Aguadilla and a bachelor apparently without a family. He lived alone.

IN RE TERREGROSA. [Vol. 25, P. R. R.

Formerly he had had illicit relations with a woman who died. Her young brother, Diego González, continued in Vergne's service and lived with him. At the time of his death Vergne was engaged to a young woman of Mayagüez. During his illness he corresponded with her, his letters being written by his nurse, Francisca Ramos, as he was unable to write them himself. His object in being operated on was to regain his health so that he might marry his fiancée.

The illness of Vergne was long and painful. He was operated on twice by Dr. Moret, who continued to attend him up to the time of his death. Besides the nurse, Temístocles Vázquez was employed to attend him permanently. There was a quarrel with the boy Diego González regarding the disappearance of some money, but he returned to the house and remained there during the last days of Vergne's life.

Temístocles Vázquez testified that he spoke to Vergne about nine or ten days before he died; that subsequently he spoke to him again but received no answer; that Vergne was "nearly dead" and that he "hardly moved." Francisco López, Vergne's partner, went to see him on the day the will was made, but went no further than the door of his room because he seemed to him to be so seriously ill that he was almost at the point of death. This witness was requested by the nurse on the same day to send her some cups and money for the wake. Diego González testified that for three days prior to his death Vergne "had his eyes cast backward and did not utter a word." The witness spoke to him but received no answer. Daniel Quintana went to see Vergne a few hours before the execution of the will and the nurse conducted him to his bedside and "raised a cloth which covered his face; I saw him and thought he was dead, but I looked here (indicating his throat) and saw that he was still living." Leopoldo Vázquez, who went to Vergne's house at the request of Vergne's partner expressly to ascertain

whether or not he wished to make a will, testified as follows: "I went into his room and called Don Artemio. I said to him, 'Don Artemio, your partner wants to know whether you wish to make a will.' He looked at me but said nothing."

A perusal of the full testimony of these witnesses, their answers upon direct and cross-examination, discloses elements which give rise to doubts as to whether Vergne was really in such a state of prostration that it was absolutely impossible for him to make the will. Nevertheless, to one who has some knowledge of the human heart; to one who observed the attitude of the witnesses when testifying; to one who has meditated upon the plan of defense of the accused and upon the length of time which has elapsed, the figure of Vergne, prostrated, dying, without control of his faculties, is brought clearly into view by the testimony of the said witnesses who, as to that particular, are entitled to the credence of the court. Besides, the other facts, which we shall now proceed to analyze, force us to incline the scales of our judgment toward the side of the truth of the charges made against the accused.

Witness Francisco López testified that Dr. Moret requested an interview with him in his office and during the same "he said to me that he was going to collect three thousand dollars as his fees and that if I wished to make a deal and give him one thousand dollars he would give me a receipt for the three thousand dollars." López refused to be a party to such a deception. Now this Dr. Moret, a relative of the person in whose favor Vergne made the will, was the one to send for the accused, who at that time was making love to a daughter of the said person to whom Vergne left his property, to attest the will; the one who, when the will was about to be executed, sent Temístocles Vázquez to his office to tell a lady, who never arrived, to wait for him, and further instructed him when he was leaving to scrub a table that was a little dirty; the one who averred that the testator

had the full use of his faculties, and the one who, with marked insistence, telephoned and telegraphed to Caguas for the names of the parents of Vergne, which appear in the will. The doctor undertook to explain his messages to Caguas as follows: That he was at the house of the heiress and the accused arrived and read the will, and the heiress said that the name inserted was not the name of Vergne's father; that if this were true Vergne's mind could not have been clear, as he had declared, for no person of a clear mind would make a mistake in naming his parents, and that then out of an excess of professional honor he endeavored to ascertain the truth; but such excess of professional honor does not harmonize with the attitude of the doctor in his interview with Francisco López, whose testimony is entitled to our credence.

Moreover, there is the failure to explain the reason for the selection of the heir. It is doubtful that there was any relationship between them. The friendly relations between the heiress and the testator were not known even to the partner of the testator. On the other hand, it would seem inexplicable that Vergne should entirely forget his fiancée. And that he should fail to call his partner, who was within easy reach in the same town, to serve as a witness or to be present at the execution of the will and send the boy Diego González away from the house in the same way that he did Temístocles Vázquez, are also significant facts. When the boy returned from the errand on which he was sent he found the house closed and could not enter. Why that precaution?

Finally, there is a circumstance which cannot fail to influence our opinion, namely, the attitude of the defense with regard to witness Enrique O. Falcón, who was called by the prosecution. From all that transpired it is evident that the said witness for the prosecution was controlled by the defense and that at the suggestion and with the aid of a paper written by the defense he claimed his privilege to be excused

from testifying on the ground that his testimony might incriminate him. It should be observed that the said witness, who appears to have signed the will for the testator at his request, had previously testified before the *fiscal* without claiming such privilege. An attempt has been made to explain that the recommendation of the defense was due to the fact that as the witness was very nervous he would run the risk of making contradictory statements if required to testify. Judging from his appearance, the witness did not seem to be so nervous. Besides, if he really had taken part in the will and signed at the request of the testator, it was a simple matter so to testify. Under all the circumstances we cannot but apply the rule that all evidence voluntarily suppressed by a party must be presumed to be adverse to such party if introduced. And it need not be noticed that in an attempt to explain the incident after the evidence was all in the defense stated, "If the court desires it Falcón can be brought to testify. The reason for his invoking his personal privilege to be excused from taking the witness stand is because he is very timid and suffers from a nervous contraction of the face which prevents his speaking before any one." It was not for the court to express such a desire. It was a matter for the defense itself to decide, and its last statement, if it showed anything, went to emphasize the fact that witness Falcón was entirely controlled by it.

In view of all the foregoing, we are of the opinion that the charge against the accused has been proved and that he should be disbarred from the practice of his professions of attorney and notary.

*Disbarred from practice as attorney and notary.*

Chief Justice Hernández and Justices Wolf, Aldrey and Hutchison concurred.